---

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| Wayne Mood, et al., individually and o/b/o a class of similarly situated persons, )<br><br>Plaintiffs, )<br>vs. )<br><br><br><br>CCC GROUP, INC., )<br>Defendant. ) | CASE NO.: 2:24-cv-7084-DCN-MGB<br><br>**CLASS ACTION** |

    Plaintiff Wayne Mood, (hereinafter "Plaintiff" and/or "Charging Parties"), brings this action against Defendant Comprehensive Industrial Construction Services / CCC Group, Inc., (hereinafter "Defendant" or "CCC"), based on the allegations set forth below:

<u>**NATURE OF ACTION**</u>

1. This action comprised of multiple causes of under Title VII of the Civil Rights Act of 1964, as amended, and Title I of the Civil Rights Act of 1991, to correct unlawful employment practices on the basis of race and to provide appropriate relief to 44 aggrieved employees, all of which being Charing Parties and Plaintiffs in this matter.

2. All Plaintiffs are similarly situated, bonded with direct correlative facts concerning the same events which gave rise to this suit.

3. "And Others," (Et. al.), as follows: Wayne Palmer, Chris Nachampasok, Illiyun Abdallah, Wendell Singleton, Sonya Magwood, Dashona Magwood, Christopher Singleton, Tristan Talbert, Tahir Pearson, Britney King, Emanuel Montgomery, Lequan Singleton, Maurice Johnson, Jason Simmons, Marlon Bannister, Victor Magwood, Mikee Sullivan, Kashia

Brown, Tariq Amin, Ricky Gilliard, Zabiea Williams, Sean Somersall, Ortore Spann, Tiffani Greenhill, James Gaddist, Jahreek Gaddist, Derrick Fennick, Patrick Love, Dontay Green, Clifford Frasier, Calvin Singleton, Levi Thompson, Marquin Bell, Corey Milligan, Darren Hahn, Carlos Williams, Hillary Plante, Ralph Beaureau, Kenard Lee, Floyd Johnson, Lenard Thomas, James Williams and Sabrina Williams.

4. Collectively, "Charging Parties" who were all adversely affected by such practices and facts outlined herein.

5. Plaintiffs all comprise a protected class of Black employees that worked out of Defendant CCC Group, Inc.'s ("CCC") Pratt Paper Mill job site located in Henderson, Kentucky.

6. This site was managed, directed, and controlled by Defendant and its representatives and agents alike.

7. Defendant subjected Plaintiffs to a hostile work environment based on their race.

8. Defendant subjected a class of other Black employees to a hostile work environment based on their race.

9. Defendant wrongfully terminated Plaintiffs on the basis of race, ethnicity and/or color.

10. Defendant wrongfully terminated a class of other Black employees on the basis of race, ethnicity and/or color.

11. Defendant demonstrated unlawful employment practices by discriminating Plaintiffs on the basis of race, color and/or ethnicity.

12. Defendant demonstrated unlawful employment practices by discriminating a class of other Black employees on the basis of race, color and/or ethnicity.

## JURISDICTION AND VENUE

13. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 451, § 1331, § 1337, and § 1343.

14. This Court has subject matter jurisdiction over all claims asserted in this Complaint.

15. This Court has personal jurisdiction over the claims asserted in this Complaint.

16. This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e-5(f)(1) and (3), and section 102 of Civil Rights Act of 1991, 42 U.S.C. § 1981a, and 18 U.S.C. § 351(e), 41 U.S. Code § 6503.

17. This action is moreover authorized and instituted pursuant to S.C. Code § 1-13-80 (2023), S.C. Code § 36-2-725 (2023), § 15-3-350, and § 41-1-30 (2023).

18. Defendant is based in San Antonio, Texas, its corporate physical address being 5797 Dietrich Road, San Antonio, TX 78219.

19. Defendant's website only shows locations in Texas, Florida, Utah, and South America, yet Defendant does business in multiple other districts across the nation, including South Carolina.

20. Upon information and belief, Defendant was also based in Columbia, SC, offering its services in various construction projects, both residential and commercial.

21. Defendant has provided a range of construction related services on projects in South Carolina, to various clients within the state.

22. Defendant's Employer Handbook does not have a choice of forum clause or provision.

23. Defendant seeks and hires prospective employees across the nation.

24. Defendant aims to bolster its influence and reputation in the construction industry,

focusing on its expansion and presence on its own and by and through various subsidiaries.

25. Defendant sought and hired all Plaintiffs named in this action, the majority of which being citizens and residents of South Carolina.

26. A total of Twenty-Seven (27) Plaintiffs are citizens and residents of South Carolina.

27. All claims asserted herein by each Plaintiff arise out of the same transaction, occurrence, and series of transactions and occurrences that gave rise to this suit.

28. Every Plaintiff is a citizen of a different state or forum than the defendant.

29. All Plaintiffs were terminated by Defendant at the same time, during the very incident described herein.

30. Defendant has continuously done business in South Carolina, including but not limited to its hiring practices with regards to the majority of Plaintiffs in this action, past physical site locations, and affiliated physical locations used in furtherance of its business practices.

31. South Carolina Plaintiff's accepted Defendant's work offer and terms while physically and legally domiciled in South Carolina.

32. The work contract formation between Defendant and the twenty-seven (27) South Carolina domiciled Plaintiffs, factually took place in South Carolina.

33. This event was the very catalyst that led to the facts and incident described herein, which brought rise to this action and all claims within.

34. The unlawful employment practices described herein, that followed were committed within the jurisdiction of the United States District Court for the Western District of Kentucky.

35. Aside from Title VII, this action instates multiple other causes of action that entail venue and jurisdiction appropriate in this Court without question. Title VII having a distinguished rule for Venue, that Plaintiff addresses below:

## TITLE VII VENUE

36. The Discrimination Charge filing requirement in Title VII is procedural, not jurisdictional.

37. Plaintiffs filed respective claims and charges with the EEOC, Louisville, KY district office, meeting the procedural requirement.

38. Venue under Title VII finds that the proper forum should be where (1) the unlawful employment practice is alleged to have been committed; (2) the employment records relevant to such practice are maintained and administered; or (3) the Plaintiff would have worked but for the alleged unlawful employment practice. If the respondent isn't found within those options, then venue would be in the forum of its domicile or principal place of business.

39. The unlawful employment practices alleged to have been committed occurred collectively in Kentucky and where Plaintiffs were located upon subsequent dealings and transactions with Defendant, including South Carolina to a significant degree.

40. 27 out of 44 Plaintiffs are domiciled in this forum, including the Lead Plaintiff, Wayne Mood.

41. After the mass termination on July 14, 2023, those Plaintiffs were forced to move back home, 27 of which being South Carolina.

42. Defendant terminated all Plaintiff's in the same transaction, while Plaintiff's were working at Defendants Pratt Paper Mill jobsite located in Henderson, Kentucky.

43. Defendant solicited Plaintiff's for original hire and for the subsequent rehire while Plaintiff's were physically located and residing in South Carolina.

44. Remote dealings, assignments, transfers, binding agreements, otherwise activities, duties and interactions in the course and scope of employment, constitutes a proper forum for venue if Plaintiffs so choose, with regards to Title VII claims.

45. This may include dealings, transactions and/or solicitations, between employer to employee, prospective employee or former employees being sought for rehire.

46. Many of these Plaintiffs received their last paycheck or two while in South Carolina, still being within privity of contract, that was breached by Defendant.

47. Defendant sent correspondence to each Plaintiff, including the South Carolina Plaintiff's, after Plaintiff's were wrongfully terminated on the basis of race and color on July 14, 2023.

48. South Carolina Plaintiff's returned back home within the jurisdiction of this forum in between the first act of discrimination and the last, the last of which occurring while Plaintiffs were still in privity of contract and located in South Carolina.

49. If not within privity of contract, considering Defendants subsequent dealings with Plaintiffs the days and weeks following July 14, 2023, then surely impliedly. Whether express or implied, the relationship of employer – employee existed, in variation as Plaintiffs describe below and herein.

50. Plaintiffs elaborate this issue in depth in these pleadings and will supplemental to these pleadings, but for purposes of assessing Venue for the Title VII claims, Venue is proper in this forum due to the acts of unlawful employment practices that gave rise to the respective claims being complained of, took place in South Carolina as well as Kentucky.

51. That the employment records were administered to Plaintiff's remotely and their employment began remotely. Including but not limited to the work offer, job descriptions, W4, binding agreements, addendums, drug screening records, emails, onboarding being accessed remotely, account information and instructions for that being administered via email.

52. Defendant instructed Plaintiffs in South Carolina to go to a South Carolina site for their respective drug screenings.

53. Plaintiffs continued receiving and following instructions from Defendant, in the course and scope of their employment.

54. The direct instructions to travel, be paid per diem, move out of state, and report to the job site in Henderson, KY. All of which occurred in South Carolina with regards to the many South Carolina Plaintiffs, including that of the lead Plaintiff.

55. That the Charleston Division particularly is the appropriate forum for venue purposes because the majority of South Carolina Plaintiffs are citizens and residents of Berkeley County, Dorchester County, and Charleston County.

56. With regards to Title VII, Plaintiffs contend as outlined herein, why this Court should be the appropriate and fair forum, however, if this Court ultimately finds that it is not the proper forum, Plaintiffs assert the respective claims should then be transferred to the United States District Court for the Western District of Kentucky, as that is where all Plaintiffs were physically working at the time of being terminated in a racially hostile and discriminatory manner by Defendant.

57. That but for the unlawful employment practices instilled by Defendant, the majority of named Plaintiffs, (27 out of 44) would have remained in South Carolina for work, instead

of being misled and relying on Defendant to honor its work offer and related terms and federally afforded rights of workers, such as Equal Employment Opportunity.

58. Instead, Plaintiffs assumed it was a good faith offer, and they would be safe and secure putting everything on the line, to go work for Defendant.

59. That a forum where Defendant is domiciled would be severely prejudicial and disadvantageous for Plaintiffs far and wide, being located across the nation, most of which here in South Carolina, including that of the lead Plaintiff Wayne Mood.

60. That a forum in the district of the Kentucky job site would be unduly, costly, burdensome, uneconomic, and inefficient, for Plaintiffs.

61. No Plaintiff is a citizen and/or resident of either of those forums.

62. The lead Plaintiff and 26 others were contacted by Defendant who availed itself in this jurisdiction to conduct interstate commerce, business, and hiring practices to engage South Carolina citizens, execute contract formation, assign them to go to a South Carolina facility for drug screening, pay them per diem and have them travel many states away for orientation, and to move their families in the process and leave their lives behind, entrusting the Defendant to honor its terms as the sacrifice being in vein amounts to an utter legal and financial hardship and in this case catastrophe.

63. The Defendant established enough contacts as described above and herein.

64. That the other causes of actions complained of herein, give this Court proper jurisdiction and venue.

65. That with regards to Title VII venue, the events that led to the incident described herein, started largely in part in South Carolina, that the binding relationship created between the parties was sought out and furthered by Defendant, contract formation being the catalyst

of the proceeding events giving rise to this action.

66. That the contract signed between employer and the 27 South Carolina Plaintiffs, instructed Plaintiffs to report to the very place they would later be abused, disseminated, discriminated, wrongfully terminated, and regarding two Plaintiffs, one of with the Lead Plaintiff (SC), Wayne Mood, assaulted and battered, all by Defendant.

67. That the employer alleged they were notified about the layoff that was conducted on July 14, 2023, which they claim was now "recalled," in email writings to Plaintiffs on Friday, July 21, 2023. Moreover, it asked Plaintiffs to return back to the jobsite Monday, July 14, 2023.

68. That on July 25, 2023, coincidentally the same day Plaintiffs council emailed its letter of representation to Defendant, Defendant contacted Plaintiff's again, alleging the "layoff" was not performed appropriately as if that wasn't already obvious, moreover that Defendant was "still trying to get to the bottom of the issue and go from there." Whereas the issue was painfully obvious in and of itself. To either end, the Plaintiffs domiciled in this forum were receiving this correspondence remotely, electronically via emails. They were in South Carolina, having to move back home.

69. That this event of discrimination extended beyond July 14, 2023, as Defendant states it will be "on site for the next 2 weeks and can guarantee no stone will be left unturned." However, the stones were certainly left unturned.

70. Upon information and belief, only one or two Plaintiffs did in fact return, and were subsequently fired within only a few weeks or less.

71. That but for Defendants unlawful breaches and other employment practices, including but not limited to violating Plaintiff's constitutional and civil rights, Plaintiff Mood and the

majority of others would have remained in South Carolina.

72. Defendant instructed South Carolina Plaintiffs to report to Defendant's designated drug screen locations in South Carolina, upon accepting Defendant's offer and signing the contract of employment which gave instructions to South Carolina Plaintiff's, and all other Plaintiffs, to travel to the first projects job site in Henderson, KY.

73. That the contract stipulated being paid per diem, which Plaintiffs were. That includes South Carolina Plaintiffs.

74. The Wieland Pratt Kentucky site conditions and details were in Defendants work offer to Plaintiffs, including the Plaintiffs domiciled in South Carolina.

75. The Wieland Pratt Kentucky site address is 6300 KY-425, Henderson, Kentucky 42420.

76. Defendant paid Plaintiffs per diem weekly as stipulated in the work contract and offer.

77. Other relevant stipulations and terms in each work agreement between Defendant and Plaintiffs are as follows;

78. To report to the Wieland Pratt, Kentucky Pratt Paper Mill jobsite for Plaintiff's work assignment.

79. A supervisor to report directly to at the Wieland Pratt site.

80. Required the ability to travel and perform work at other locations Defendant deems necessary.

81. The anticipated "6-9" months to work at the Wieland Pratt Kentucky site.

82. Required drug screening and background checks.

83. Required motor vehicle report for employees tasked with driving.

84. To be employed for an indefinite period by Defendant on an "at-will" basis.

That Defendant "CCC" is an equal opportunity employer and committed to maintaining

an environment that encourages and fosters appropriate conduct and respect, free of discrimination, harassment, and retaliation.

## **JOINDER OF PARTIES**

85. All previous paragraphs are incorporated by reference as if fully set forth herein.

**86.** Plaintiffs in this action is appropriate and lawful, pursuant to Fed. R. Civ. P. 20.

87. Plaintiffs were all Charging Parties prior to the institution of this action.

88. Plaintiffs are similarly situated, bonded with direct correlative facts concerning the same events and facts which gave rise to this suit.

89. Plaintiffs assert any and all rights to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, and/or series of transactions and occurrences; and

90. Every and any question of law or fact common to all Plaintiffs will arise in this action, Fed. R. Civ. P. 20(a)(1).

91. Each having an individual suit would be impracticable and uneconomical, for Plaintiff, prospective plaintiffs, and Defendant.

92. Each having an individual suit would be overly burdensome to the parties, this Court as well as other federal and/or state forums.

93. Plaintiffs all have a material interest in this action and should be joined as parties so that they may be heard and a complete disposition made.

94. Not one Plaintiff named in this action objects to venue.

95. Allowing all named Plaintiffs to remain in this one action already furthers the purpose of Joinder.

96. Any alternative would result in delay.

97. No Plaintiff comprises diversity.

## **PARTIES**

98. Upon information and belief, Plaintiffs commencing this action are domiciled as follows:

99. Plaintiff Wayne Mood is a citizen and resident of Berkeley County, South Carolina.

100. Plaintiff Wayne Palmer is a citizen and resident of Berkeley County, South Carolina.

101. Plaintiff Chris Nachampasok is a citizen and resident of York County, South Carolina and Franklin County, Ohio. Ohio being the state of domicile.

102. Plaintiff Illiyun Abdallah is a citizen and resident of York County, South Carolina.

103. Plaintiff Wendell Singleton is a citizen and resident of Berkeley County, South Carolina.

104. Plaintiff Sonya Magwood is a citizen and resident of Charleston County, South Carolina.

105. Plaintiff Dashona Magwood is a citizen and resident of Charleston County, South Carolina.

106. Plaintiff Christopher Singleton is a citizen and resident of Berkeley County, South Carolina.

107. Plaintiff Tristan Talbert is a citizen and resident of Charleston County, South Carolina and Wayne County, Mississippi. Mississippi being the state of domicile.

108. Plaintiff Tahir Pearson is a citizen and resident of Delaware County, New York.

109. Plaintiff Britney King is a citizen and resident of Forrest County, Mississippi.

110. Plaintiff Emanuel Montgomery is a citizen and resident of Darlington County, South Carolina.

111. Plaintiff Lequan Singleton is a citizen and resident of Dorchester County, South Carolina.

112. Plaintiff Maurice Johnson is a citizen and resident of Cabell County, West Virginia.

113. Plaintiff Jason Simmons is a citizen and resident of Dorchester County, South Carolina.

114. Plaintiff Marlon Bannister is a citizen and resident of Dorchester County, South Carolina.

115. Plaintiff Victor Magwood is a citizen and resident of Charleston County, South Carolina.

116. Plaintiff Mikee Sullivan is a citizen and resident of Ascension Parish, Louisiana.

117. Plaintiff Kashia Brown is a citizen and resident of Charleston County, South Carolina.

118. Plaintiff Tariq Amin is a citizen and resident of Forsyth County, North Carolina.

119. Plaintiff Ricky Gilliard is a citizen and resident of Dorchester County, South Carolina.

120. Plaintiff Zabiea Williams is a citizen and resident of Daviess County, Indiana.

121. Plaintiff Sean Somersall is a citizen and resident of Sullivan County, Tennessee

122. Plaintiff Ortore Spann is a citizen and resident of Berkeley County, South Carolina.

123. Plaintiff Tiffani Greenhill is a citizen and resident of Berkeley County, South Carolina.

124. Plaintiff James Gaddist is a citizen and resident of Dorchester County, South Carolina.

125. Plaintiff Jahreek Gaddist is a citizen and resident of Dorchester County, South Carolina.

126. Plaintiff Derrick Fennick is a citizen and resident of Berkeley County, South Carolina.

127. Plaintiff Patrick Love is a citizen and resident of Saint Louis County, Missouri.

128. Plaintiff Dontay Green is a citizen and resident of Saint James Parish, Louisiana.

129. Plaintiff Clifford Frasier is a citizen and resident of Berkeley County, South Carolina.

130. Plaintiff Calvin Singleton is a citizen and resident of Berkeley County, South Carolina.

131. Plaintiff Levi Thompson is a citizen and resident of Berkeley County, South Carolina.

132. Plaintiff Marquin Bell is a citizen and resident of Ascension Parish, Louisiana.

133. Plaintiff Corey Milligan is a citizen and resident of Berkeley County, South Carolina.

134. Plaintiff Darren Hahn is a citizen and resident of Ascension Parish, Louisiana.

135. Plaintiff Carlos Williams is a citizen and resident of Dekalb County, Georgia.

136. Plaintiff Hillary Plante is a citizen and resident of Ascension Parish, Louisiana.

137. Plaintiff Ralph Beaureau is a citizen and resident of Ascension Parish, Louisiana.

138. Plaintiff Kenard Lee is a citizen and resident of Clarendon County, South Carolina.

139. Plaintiff Floyd Johnson is a citizen and resident of Davidson County, Tennessee.

140. Plaintiff Lenard Thomas is a citizen and resident of Williamsburg County, South Carolina.

141. Plaintiff James Williams is a citizen and resident of Florence County, South Carolina.

142. Plaintiff Sabrina Williams is a citizen and resident of Florence County, South Carolina.

## DEFENDANT "CCC"

143. Defendant is a nationally ranked heavy industrial general construction contractor, providing construction, maintenance, equipment rentals and repair services.

144. Defendant was founded in 1947, serving the national community.

145. Defendant began serving the international community in 1995.

146. At all relevant times, Defendant has employed well over 500 employees.

147. Defendant currently has approximately 2,500 employees.

148. At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce.

149. Defendant has multiple regional, national, and international offices providing a wide

array of construction services to various markets within the United States and in select foreign nations.

150. Defendant advertises and describes itself as a full-service industrial contractor, "a self-perform company" that "directly execute(s) over 90% of [its] contracted work with CCC Group Labor Forces, trained and directed under [its] management."

151. Defendant has an active USDOT number of 136411 and DUNS number of 15-181-8457.

152. Defendant's motor carrier highway transportation activities are incidental to and in furtherance of its primary business activities, according to the Federal Motor Carrier Safety Administration ("FMCSA").

153. Defendant operates interstate, carrying cargo in the form of machinery, large objects, motor vehicles, passengers, metal, sheets, coils and rolls, according to the FMCSA.

154. Defendant was incorporated in San Antonio, Texas.

155. Defendant's headquarters and corporate address is at 5797 Dietrich Road, San Antonio, Texas 78219.

156. Defendant is registered to do business in Texas and Florida, with offices in Texas, Florida, Utah, and its international division located in Para, Suriname, South America.

## EXHAUSTED ADMINISTRATIVE REMEDIES

157. Within 90 days of this action, Plaintiffs received their Right to Sue Notice(s) from the EEOC.

158. Prior to this, Plaintiffs filed respective claims and charges with the EEOC against the Defendant.

159. Plaintiffs' council received notice via email from the EEOC that the first of the 44

charges were dismissed on September 8, 2024.

160. Plaintiffs respective right to sue letters were addressed to Plaintiffs mailing addresses, however, did not specify whether normal postage or certified.

161. Plaintiffs undersigned counsel was the first to inform Plaintiffs of their right to sue letter being issued, after receiving the email for the first charge dismissal on September 8, 2024.

162. That despite Plaintiffs not ever actually receiving right to sue letters themselves, their representative received such in writing on September 8, 2024.

163. Upon information and belief, 44 Plaintiffs failed to receive anything from the EEOC, despite the letters designating being addressed to each Plaintiffs respective home mailing addresses.

164. By and through their undersigned attorney receiving such notice via email on September 8, 2024, that the first of 44 charges were dismissed.

165. This Complaint is timely, with regards to each cause of action, this includes causes of actions under Title VII.

166. Plaintiffs have exhausted administrative remedies with the Equal Employment Opportunity Commission prior to the institution of this Action.

## FACTS

167. All previous paragraphs are incorporated by reference as if fully set forth herein.

168. On July 14, 2023, Plaintiffs were all employed with the Defendant, roughly two months into their respective 6–9-month contract to work at the designated Pratt Paper Mill jobsite located in Henderson, Kentucky.

169. That the binding agreements signed between all parties particularly states an estimated

6-9 months at the first job site, but the employment itself was designed expressly as "indefinite."

170. Plaintiffs were told by Defendant the morning of July 14, 2023, that they were being laid off for "lack of production," despite Plaintiff having been recently promoted with pay raise and bonus.

171. Prior to the racially charged and hostile incident that unfolded later that morning, Defendants first instructed Plaintiffs to perform demeaning and humiliating duties for the first time, that deviated from what they were hired on as and had nothing to due with their job duties.

172. Defendant cruelly made Plaintiffs pick up trash and filth on the jobsite, knowing that they would be firing Plaintiffs that very day, after they were done picking up trash.

173. The incident began with the lead-Plaintiff and Charging Party Wayne Mood being told by Supervisor Kris-Ann Neal to "get your tools and come up to the gate, you're being laid off for lack of production."

174. Upon information and belief, Defendant representative and/or agent Neal was accompanied by her colleague and husband, also employed by Defendant, Trevor Neal.

175. Among others, Defendants General Manager, foreman, and other supervisors were on site.

176. Kris-Ann Neal, Trevor Neal, Will Brown, and the General Manager were all white.

177. Defendant already decided prior to July 14, 2023, that it would terminate its entire night shift.

178. All Plaintiffs were on the night shift, 42 being black, the other 2 being of a different minority.

179. Supervisor Neal, Trevor, Brown, among others were all white, belonging to the day shift.

180. Defendant segregated their employees in this manner, putting all the Black employees on the night shift, whites on the day shift.

181. Defendant by and through their own admission, favored the day shift for their "tenure."

182. Defendant by and through their own admissions, planned to terminate Plaintiffs and "eliminate the night shift."

183. As if being segregated wasn't enough, Defendant made Plaintiffs also perform less favorable, humiliating and demeaning, mundane, tasks prior to reading out the prepared list containing all of their names for termination, prior to being threatened, called racial slurs, other profanity, and assaulted.

184. Defendant Neal possessed a list of employees that included every named Plaintiff and Charging Party listed in this action, as she was seen reading and checking off the names during this incident.

185. Defendant asked the names of Plaintiffs, all of which were Black, with the exception of two who belonged to other minority and/or ethnic background.

186. Defendant by and through their agent Kris-Ann Neal and Trevor Neal were smiling as they proceeded to ask Plaintiff's and Charging Parties their names while checking them off the termination list.

187. Plaintiff Mood and others were asked to gather their tools and go up to the gate.

188. Plaintiff Mood advised he is unable to gather his tools because they were reported as stolen from his respective toolbox.

189. Upon information and belief, Defendant's General Manager Jeff advised Plaintiffs the

tools may be missing after he instructed someone on the jobsite to drill holes in

Plaintiffs lockboxes after alleging employees were taking advantage of CCC Group

issued tools.

190. Plaintiff Mood asked Defendant representative / agent / employee Kris-Ann Neal once

more if his name was on the layoff list.

191. Neal affirmed saying "yes, your name is on the fucking list, get up to the fucking gate."

192. Plaintiff Mood took out a cigarette and upon lighting it was assaulted and battered by

Defendant, when Kris-Ann Neal lunged at Plaintiff Mood, striking him and the cigarette

resulting in a swollen eye, and burns to Plaintiff Mood's fingers and cornea.

193. Defendant, vicariously, by and through their agent, employee and/or representative

Kris-Ann Neal then yelled out to all named Plaintiffs and Charging Parties, and other

class-members similarly situated, "All of you niggers are laid off for lack of production.

All of you niggers get to the fucking gate."

194. Defendant employee Trevor Neal then lunged at Plaintiff Mood, shoving and pushing

him prior to other employees attempting to separate the two.

195. Plaintiff Mood thereafter sought out his missing tools, not the tools that were issued by

the Defendant, to no avail, the tools he owned were never located or accounted for.

196. Plaintiff Mood did not want to leave the premises until securing his belongings but once

being unsuccessful in finding his tools, he proceeded to walk to the open area when he

made contact with Defendants General Manager Jeff and other supervisors employed by

Defendant.

197. Plaintiff Mood then advised he wants to press charges and asked for the police to

respond due to the assault and battery described above and herein, that was committed

by employee-supervisor Neal and her husband.

198. Defendant's General Manager Jeff then contacted the Henderson County Sherriff's Office pursuant to Plaintiff Mood's request.

199. Upon information and belief, Defendant's General Manager Jeff then told supervisor Kris-Ann Neal to leave so she wouldn't be arrested.

200. Once the police arrived, they advised Defendant to call supervisor Neal back to the job site. They then took pictures of Plaintiff Moods eye.

201. The responding officers advised they would not be arresting Neal due to the supposed laws in Kentucky that entail the battery must have been witnessed by law enforcement or be considered domestic in nature.

202. The incident in its entirety above, including the subsequent alteration, assault and batteries then committed, including that of the egregious conduct and racially charged manger, including the verbatim quoted profane racial slurs being yelled upon firing over 44 black employees, were witnessed by the vast majority of the named Plaintiffs and Charging Parties.

203. Plaintiff Mood and others proceeded to leave the job site once the police left. Upon doing so, Defendant, vicariously by and through its General Manager Jeff, yelled profanity to Plaintiffs. Specifically, he yelled "walk off, motherfucker, walk off," to Plaintiff Mood and others.

204. While doing so, Defendant General Manager Jeff and supervisor Trevor Neal were standing by supervisor Kris-Ann Neal, as seen and witnessed by Plaintiff Mood and others who then left the site.

205. A formal police report of the above, including witness statements by Plaintiff Mood,

and other Plaintiffs who gave statements, was annotated by the Henderson County
Sherriff's Office, pursuant to the incident described above and herein. Police Report
Number 23-30517.

206. The incident in its entirety was reported to Defendant and witnessed by Defendant.

207. A formal complaint was made to Defendant's Human Resource Analyst Sofia De Los
Santos.

208. Plaintiffs were all hired via work contract that Defendant breached roughly 1-2 months
in.

209. Plaintiff Mood and others were recently promoted within recent proximity of time
leading up to this incident. inclusive of pay raises.

210. Defendant's Vice President contacted Plaintiff Nachampasok via telephone call, which
was recorded, stating he's out of the corporate office, in San Antonio, Texas and was
notified of the layoffs and incident described above.

211. Plaintiff Nachampasok responded saying he was assaulted. Defendant's Vice President
said that it didn't go through the proper channels and asked if he would be willing to
come back to work the following Monday and asked who Plaintiff Nachampasok was
with.

212. Plaintiff Nachampasok responded he was with Plaintiff Wendell Singleton, Plaintiff
Illiyun Abdallah, and everyone else named in this action.

213. Defendant Vice President stated the company contacted everyone apologetically and
asked Plaintiffs to return to the same site, that they wanted to "make this right."

214. Aside from the call and recorded conversation with Defendants Corporate Officer
described above, Defendant also emailed Plaintiffs in the days and weeks that followed

this incident date of July 14, 2023.

215. Defendants Human Resources advised in writing that they were on site as of July 17, 2023, to investigate the incident and the layoffs that they wish to "recall."

216. Defendant emailed Plaintiffs stating they were notified of a layoff that was "not performed appropriately with proper approvals." Moreover, that they will be "on site for the next 2 weeks and can guarantee no stone will be left unturned." Furthermore stating "we understand if you choose not to come back to the work site, but we want to make you aware of the opportunity."

217. Defendant states by and through its corporate officer(s) and human resources that it was still investigating weeks after the incident and offered for employees to return prior to the close of that investigation.

218. Plaintiff Wendell Singleton addressed the concern to Defendant, that Defendant supervisors who were involved in terminating him and every other Plaintiff named, Charging Parties, and other class members similarly situated, were still present at the jobsite.

219. Upon information and belief, the Defendant supervisors who were closely involved and present during the racially charged egregious incident described above and herein, that remained at the jobsite include but are not limited to, Will Brown, Ricardo Vargas, and its General Manager Jeff.

220. On July 21, 2023, at 3:08PM, Defendant's Human Resource Senior Specialist, Leticia Fietek, emailed Plaintiffs that they want to recall the layoff that was reported from the Wieland Pratt Jobsite located in Henderson, Kentucky. "If you are interested in continuing work for CCC Group we ask you to report back to the jobsite Monday, July

24, 2023, at 6AM. HR will continue to have a presence over the next few weeks. Should you need to schedule time to speak with HR, Sofia De Los Santos or the Project Manager, Ricardo Vargas, please respond to this email and we will schedule a time."

221. No Plaintiff was a resident or citizen of Kentucky when offered and accepting Defendant's job offer that stipulated 6 months in Henderson, KY.

222. Plaintiffs relied on Defendants good faith offer to work somewhere safe and free from a hostile work environment, violence and racism.

223. Plaintiffs left their home upon accepting Defendant's offer, the vast majority of them being residents and citizens of South Carolina, and others home to various other states.

224. Plaintiffs moved to another state, putting their livelihood and families on the line to work for Defendant in Kentucky.

225. By the time Plaintiffs were forced out, in the hostile, discriminatory and racist manner described above and herein, Plaintiffs then had to relocate, many of which had no choice but to move back to their home and begin seeking other employment.

226. Defendant took no consideration in this regard. Defendant was only concerned about their own liability exposure.

227. Defendant failed to report this incident and/or related internal complaints to the EEOC, as required and Ordered by Judge Frederick J. Scullin in the U.S. District Court for the Northern District of New York, (see EEOC v. CCC Group, Inc., Civil Action No. 1:20-cv-00610).

228. Defendant failed to cooperate with the EEOC and declined to participate in mediation according to the assigned investigator.

**PATTERN OF BEHAVIOR**

22

229. All previous paragraphs are incorporated by reference as if fully set forth herein.

230. Defendant's history exhibits and reveals similar actions and pattern of behavior as described and complained of above and herein.

231. EEOC has previously found in its own lawsuit against this Defendant, that Defendant created and maintained a racial hostile work environment in violation of VII because of its failure to prevent known racial harassment from continuing.

232. As part of that cases investigation, whose subsequent suit was actually brought by the EEOC, findings included that Black and/or African American employees of Defendant were racially abused and targeted, calling them "gorillas," "monkeys," and "lazy."

233. Moreover, the EEOC found and contended in its suit and dispositive consent order decree and settlement, that Defendant subjected its Black employees to harsher working conditions than white employees.

234. That white employees were assigned less physically demanding job duties, that Black employees were made to do more dangerous, physically demanding work, in harsher conditions.

235. That Defendant forced its Black employees to even work outdoors in the winter, while white employees worked indoors.

236. In 2020, EEOC filed suit against Defendant in the U.S. District Court for the Northern District of New York.

237. Suit was filed against Defendant after the parties failed to reach a pre-suit settlement through the agency's conciliation process.

238. The suit alleged in 2016, Defendant subjected its Black employees working at the company's Ravena, New York site to racial slurs and a noose.

239. It further alleged that Defendant's white supervisors and other employees made racist comments frequently to its Black employees, including over a radio for everyone to hear.

240. Moreover, that a white supervisor used a noose to intimidate and/or threaten a black employee.

241. That a different white supervisor told a Black employee for Halloween, "You don't even have to dress up. I will dress in white and put a noose around your neck and we'll walk down the street together."

242. Furthermore, that a different white employee openly bragged about his ancestors' owning slaves.

243. Lastly, that another white employee told a Black employee he walked funny because slaves used to walk with a bag on their shoulder picking cotton.

244. Defendant ultimately paid $420,000.00 to settle.

245. Judge Franklin J. Scullin entered a three-year consent decree which provided monetary damages for 7 Black employees who were harassed and discriminated by Defendant in the manner and instances described above.

246. It also ordered Defendant to administer company-wide training to educate managers and employees about harassment and discrimination issues in the construction industry. That the company must conduct a "lesson learned" presentation with management, focusing on the issues from the EEOC complaint, to appoint an EEO Manager tasked with investigating internal complaints, promote anti-harassment trainings, and visit worksites to discuss EEO issues.

247. This Order and Decree also required Defendant to periodically report to the EEOC

regarding any and all future allegations of racial harassment.

248. Lastly, the Decree barred / bars Defendant from ever employing or contracting with two white supervisors who served as foreman for Defendant on the Ravena worksite and who were alleged by the EEOC to have harassed Black employees.

249. Needless to say, Defendant failed to comply, seemingly so in its entirety.

<u>**EQUAL EMPLOYMENT OPPORTUNITY COMMISSON**</u>

250. Upon information and belief, the Commission has yet to do anything about Defendants non-compliance and breach of the District Courts Order and Decree, in the case referenced above.

251. Even to this day, meaning despite Plaintiffs whopper of a case with its own very similar and egregious facts and conducts that were perpetrated by Defendant.

252. Somehow, no determination of merit was deemed or made by the EEOC in this matter, for any of the Charges filed by all Plaintiffs.

253. All charges were dismissed, which brings us here today by and through this Complaint before this Court.

254. Plaintiffs respective right to sue letters were erroneously mishandled, nor sent to Plaintiffs despite it being addressed to their home mailing addresses.

255. The EEOC failed to properly investigate this matter, despite being handed overwhelming information and exhibits, that will be made available and discoverable as part of this case.

256. None of the Plaintiffs were interviewed nor were ever contacted by the Commission.

257. None of the Plaintiffs received their respective Right to Sue letters, as stated above, Plaintiffs undersigned counsel received an email on September 8, 2024 stating the first

charge out of 44 was dismissed.

258. Defendants have failed to comply with the Consent Order and Decree that was entered in the United States District Court for the Northern District of New York, August of 2021.

259. Plaintiffs find it very concerning to learn of all of this at this stage, considering the EEOC failed to address this whatsoever, even though it was by and through their own lawsuit against Defendant.

260. Moreover, that after providing overwhelming evidence and facts that show good cause and merit, no findings of merit were made, no interviews were conducted, no subpoenas were issued, charges were all dismissed, and right to sue letters were never mailed to Plaintiffs. 44 Plaintiffs for 44 charges with the same exact Defendant that the Commission sued just a few years ago.

261. Instead, the EEOC chose to settle Plaintiffs 44 charges with Defendant in this case, stipulating the same injunctive relief that they have already shown utter noncompliance of to an extreme and daunting degree.

262. This matter deserves attention, deserves better care, and demands justice.

## STATEMENT OF CLAIMS

### Count I

**Hostile Work Environment**

263. All previous paragraphs are incorporated by reference as if fully set forth herein.

264. 42 of the 44 Plaintiffs and Charging Parties are Black. Two of which are Asian, Native American, and/or other ethnic minority background.

265. Throughout the course of Plaintiffs employment with Defendant CCC, they were

subjected to racially charged verbal abuse, epithets, profanity, and slurs from white supervisors and co-workers, threatening conduct and being forced to work in demeaning and humiliating conditions before being terminated.

266. Prior to the incident described above and herein that took place July 14, 2023, Plaintiffs were all instructed to perform trash pickup duties on the site, deviating significantly from their job duties and description.

267. Defendant wanted to exploit Plaintiffs by having them perform such duties right before enacting its mass termination of Plaintiffs and other class members similarly situated.

268. As described above, Plaintiffs were all on a list generated by Defendant with the sole purpose to discharge them 1-2 months into their 6-month contract.

269. As described above, Plaintiffs were all called the N-word amongst other profanity in the course of being terminated.

270. Defendant engaged in unlawful practices of employment, violating Section 703(a)(1) of Title VII, 42 U.S.C. 2000e – 2(a)(1), by subjecting Plaintiffs, Charging Parties and other class members similarly situated to a hostile work environment based on their race, color and/or ethnicity.

271. These unlawful work practices and violations complained herein adversely affected the condition and terms of Plaintiffs and others employment, adversely affecting their employment status due to their race and deprived them of equal employment opportunities.

272. Such unlawful employment practices were intentional, done with malice or with reckless indifference.

**Count II**

**Title VII of the Civil Rights Act of 1964**

**U.S.C. §§ 2000e, 2000e-17**

**Employment Discrimination (Race, Color, Ethnicity) & Wrongful Termination**

273. All previous paragraphs are incorporated by reference as if fully set forth herein.

274. 42 of the 44 Plaintiffs and Charging Parties are Black. Two of which are Asian, Native American, and/or other ethnic minority background.

275. Plaintiffs were segregated from the white employees, on opposite shifts and made to perform more physically demanding and humiliating tasks than the white employees.

276. Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, national origin, sex, or religion.

277. That on July 14, 2023, Defendant terminated its entire night shift, comprised of Black employees in a racially egregious, hostile and toxic manner described above and herein.

278. Defendants' reasons for doing so are a pretext to discrimination.

**Count III**

**Breach of Contract**

279. All previous paragraphs are incorporated by reference as if fully set forth herein.

280. Plaintiffs were given indefinite contracts which stipulated the 6-month duration at the Pratt Paper Mill KY site.

281. Defendants, as mentioned and described herein, wrongfully terminated Plaintiff's, roughly 1-2 months into their contract.

282. As such Plaintiff's sustained consequential damages, the rest of which is outlined in the

Damages provision in this Complaint.

## Count V

### Constructive Discharge

283. All previous paragraphs are incorporated by reference as if fully set forth herein.

284. Defendant deliberately made Plaintiff's working conditions so intolerable that Plaintiff's were forced into not returning back to the jobsite after the incident and the hostile racially charged manner and conduct in which Defendant terminated Plaintiffs on July 14, 2023.

285. Even though Defendant asked Plaintiff's to return to the jobsite, that they wished to "recall" the wrongful layoffs and racist conduct of its representative and subordinate employees, Defendant is still equally liable for the illegal conduct involved therein, as if they didn't ask Plaintiff's to return in the days and weeks following their exercise of wrongfully Plaintiff's on July 14, 2023.

286. Plaintiff's who chose not to return after such an egregious, racist and hostile event at the job site, committed during the commission of an organized preplanned written list and enforcement of a mass layoff terminated list, acted as any reasonable person in Plaintiff's shoes would have felt, compelled to leave when told and not return upon their employers request.

287. A greater degree of harassment exists here than required by a standalone hostile work environment claim.

288. Defendant reassigned Plaintiff's to menial or degrading work prior to termination and prior to asking Plaintiffs to return thereafter.

289. Defendant badgered, harassed, and humiliated Plaintiff's in a calculated manner to

encourage Plaintiff's departure.

290. Aggravating factors are present here, as Defendant fostered a hostile work environment for Plaintiff's.

291. Moreover, Defendant exhibited invidious intent to create or perpetrate intolerable conditions compelling Plaintiff's to not return.

## Count VI

### Intentional Tort (Assault & Battery)

292. All previous paragraphs are incorporated by reference as if fully set forth herein.

293. On July 14, 2023, at Defendant's Pratt Paper Mill jobsite located in Henderson, Kentucky, Defendant, with the intent to cause harmful or offensive contact, unlawfully struck, grabbed and/or shoved Plaintiff Mood and unlawfully grabbed and/or shoved Plaintiff Nachampasok.

294. As a direct result of Defendant's actions, Plaintiff's sustained physical injuries including but not limited to burns, cuts, abrasions, pain, as well as mental injuries for emotion distress and anguish and other damages.

## Count VII

### Intentional Infliction of Emotional Distress

295. All previous paragraphs are incorporated by reference as if fully set forth herein.

296. Defendant's actions described above and herein that largely took place on July 14, 2023, were intentional and/or reckless as well as extreme and outrageous.

297. These actions committed directly and vicariously by Defendant actually, directly and proximately caused Plaintiff's severe emotional distress.

298. Defendant's conduct was so extreme in degree and outrageous in character, that it went

beyond all possible bounds of decency.

299. Defendant's conduct was atrocious and utterly intolerable in a civilized community.

300. That any average member of the community would agree upon learning of the facts alleged by Plaintiff's herein, that Defendant's conduct was outrageous.

## Count VIII

### Negligent Hiring & Supervision

301. All previous paragraphs are incorporated by reference as if fully set forth herein.

302. Defendant had a duty to properly hire, train and supervise its employees and/or representatives.

303. Defendant breached those duties by failing to adequately train and supervise certain actors who were behind the facts, actions and omissions, that each in part, gave rise to this suit and the causes of actions within.

304. Defendant actors include but are not limited to Kris-Ann Neal, Trevor Neal, General Manager Jeff, Ricardo Vargas and William Brown.

305. Defendant is vicariously liable for the negligence of its employees.

306. Defendant is vicariously liable for its own negligence.

307. Defendant knew or should have known that its employees and/or representatives on the job site posted a risk to others.

308. Defendant knew or should have known that such employees, supervisors, and/or representatives posed a significant risk to Plaintiffs.

309. Defendant failed to properly vet its troublesome, violent, and/or racist employees described, including those already identified and those who are not at this time, during the hiring process.

310. Defendant failed to properly supervise its troublesome, violent, and/or racist employees mentioned herein.

311. Defendant failed to conduct thorough and equally applicable and weighted background checks, including that of criminal history and proper employment verification.

312. This failure directly led to Defendant's employees and/or agents implicated herein, to cause harm to Plaintiffs.

## Count IX

### 42 U.S.C. § 1983

313. All previous paragraphs are incorporated by reference as if fully set forth herein.

314. Defendant's General Counsel and Corporate Secretary announced his retirement in 2018, after a 35-year career with Defendant.

315. His successor, Joe A. Garza started worthing for Defendant in 2009, replacing his retired predecessor, Tim Henning.

316. Garza was a lawyer, who attended St. Mary's University School of Law.

317. Garza manages the legal and risk management departments and has since 2009.

318. Garza's responsibilities with the company were negotiating complex construction contracts, management of all internal and external litigation and dispute resolution efforts.

319. Moreover, Garza's duties entailed addressing company-wide insurance and bonding matters, developing and overseeing HR policies and procedures, resolve employment claims, manage corporate records; and serve as counsel of the company's board of directors.

320. Rob Urban was named Executive Director of Operations by the Defendant's Board.

321. Prior to that, Urban served four years active duty as a Captain in the United States Marine Corps.

322. Urban started working for Defendant in 1980.

323. Prior to his recent role, he was Vice President of the Western Group and a member of their board of directors.

324. Urban has managed and overseen regional office operations for Defendant, a wide variety of projects, specializing in construction of coastal marine projects, oil and gas, power and cement.

325. Defendant is a private company who has acted under color of state law.

Private actions are considered state actions pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983, when there is a close nexus between state and challenged action that seemingly private behavior may be fairly treated as that of state.

326. Defendant is "a self-perform company" that "directly execute(s) over 90% of [its] contracted work with CCC Group Labor Forces, trained and directed under [its] management."

327. Defendant's own Company LinkedIn page, states what they do in different categories and fields.

328. Among these duties listed are, community and social services, healthcare services, military and protective services, program and project management, engineering and operations.

329. Among these duties, and the entirety of Defendant's operations, influence, affiliations, and contacts, some of the activity falls within traditional public function and/or entails a significant enough level of government involvement to be considered a state actor or

acting under the color of state law.

330. Defendant, by and through its actions and omissions, deprived Plaintiffs of a right secured by the U.S. Constitution, while acting under color of state law.

331. Upon information and belief, Defendant was performing a function traditionally the exclusive prerogative of the state.

332. Upon information and belief, state actors significantly encouraged Defendant to engage in complained-of-conduct; and/or

333. A state actor hast insinuated itself into a position of interdependence with the Defendant that it was a joint participant in its enterprise.

334. That this relationship is intertwined with regards to being symbolically symbiotic; and

335. Furthered the specific conduct which Plaintiffs complain of herein.

336. Plaintiff reserves the right to amend and supplement pleadings to provide more information behind this cause of action.

337. That the responding officer who came to the job site after the assault and incident described herein, advised lead Plaintiff Mood that he cannot arrest Supervisor Neal due to KY law stating only domestic violence related battery and/or assaults that law enforcement agents witness themselves can result in arrest.

338. That he was incorrect, that is not the law, and he should have arrested the culprit for her crimes.

339. That Defendant's General Manager spoke with the officer on site, some of which in private before he concluded his report.

340. Furthermore, the EEOC is a state actor who sued Defendant in 2020 for very similar conduct.

341. Defendant's history of not abiding by past orders of injunctive relief in recent years and litigation. Upon information and belief, upon reviewing Case No. 1:20-cv-00610, in the U.S. District Court for the Northern District of New York, Defendant is in breach and/or contempt of court for not abiding by the Order set forth that stipulated multiple injunctions designed to eradicate past racially charged egregious conduct and unlawful work practices, to no avail.

342. Upon reviewing the EEOC's settlement with the same Defendant in our case from the 2020 suit by EEOC against Defendant, it is clear that they did not learn a lesson before and have shown a clear disregard and utter disrespect for the Court's Order for Injunction Relief.

343. Sadly, the relief Ordered is almost identical to what the EEOC agreed to settle with this time around in Plaintiff's action before this Court.

344. Moreover, it became apparent that Defendant disobeyed express Orders in the Decree to report further instances or acts of racial discrimination and/or harassment on the jobsite. Moreover, Plaintiffs are needing to be made whole again for the vast damages that are outlined in its Complaint before this Court.

345. Sadly, EEOC not only handed Defendant another slap on the wrist, despite the pattern of behavior and continuous unlawful employment practices. The NY case referenced in this paragraph revealed a very alarming number of similar patterns of behavior, among many findings, one of which is worthy of highlighting here, whereas the rest is more or less in the Complaint, is that EEOC findings revealed evidence that Defendant has employed members of white supremacy groups and/or those who sought membership while employed.

346. Plaintiff asked this Court to review Case No. 1:20-cv-00610 as it closely relates to the issues and redressability concerning this case. Lastly, the EEOC apparently didn't take action or perhaps even correlate the fact that the Defendant disregarded stipulations in the Order because it is irrefutable fact that Plaintiff's by and through their undersigned counsel, reported the unlawful practices in the scope of this case to the EEOC, months after Defendant became aware of the facts and literally was apart of and witnessed the incident described in Plaintiff's Complaint.

347. So, in summation, the EEOC and Defendant failed to properly address this matter during the administrative stage and clearly it is more of an epidemic rather than an isolated event.

348. That the Henderson County Sheriff's Office worked with Defendant in not arresting Supervisor Neal and lied to Plaintiff about the law.

349. That the EEOC did mishandled these charges despite overwhelming evidence, and including that of their own case prior and findings, not to mention the contempt and breach of their settlement stipulations in the Decree.

350. The EEOC worked with the Defendant in collusion or was grossly negligent.

**<u>Damages</u>**

351. Plaintiffs and Charging Parties were subjected to harassment, hostile work environment, breach of contract, employment discrimination and wrongful termination by Defendant, based on their race, color and/or ethnicity.

352. As a result, Plaintiffs and Charging Parties suffered damages which include but are not limited to past, present and future, including but not limited to job search expenses, moving costs, consequential damages, lost wages, compensatory damages, both

economic and non-economic and back-pay;

353. Moreover, damages for non-pecuniary losses, past, present and future, resulting from the unlawful employment practices described herein, including but not limited to emotional pain, suffering, inconvenience, humiliation and loss of enjoyment of life.

354. As a direct result of Defendant's intentional tort and intentional torts committed, Plaintiff's suffered damages including but not limited to pain and suffering, emotional distress, punitive damages and lost wages.

355. Defendant subjected a class of Black employees working out of the Wieland Pratt Paper Mill job location in Henderson, Kentucky.

356. As a result of Defendant "CCC" subjecting this class of Black employees to harassment and a hostile work environment based on their race, the Black employees suffered damages.

357. Upon information and belief, a class of other Black employees working for Defendant have suffered the same or similar damages and are thus entitled to relief should this Court decide to grant certification upon motion by Plaintiff in this action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs and Charging Parties respectfully requests that this Court:

358. Order Defendant "CCC" to implement and administer policies, programs and practices that provide equal employment opportunities for Black employees that will vanquish the past and present effects and stain of its unlawful employment practices;

359. Grant an injunction enjoining Defendant, its agents, officers, parent(s), subsidiaries, assigns, managers, successors, employees, and all persons in participation with Defendant, from discriminatory conduct based on race.

360. Order Defendant to compensate Plaintiffs and Charging Parties to make whole for their losses, past, present and future, including but not limited to job search expenses, moving costs, consequential damages, lost wages, compensatory damages, both economic and non-economic and back-pay, resulting from the unlawful employment practices complained of herein, in amounts to be determined at trial, and other relief that this Court deems fit.

361. Order Defendant to compensate Plaintiffs and Charging Parties to make whole for their non-pecuniary losses, past, present and future, resulting from the unlawful employment practices described herein, including but not limited to emotional pain, suffering, inconvenience, humiliation, loss of enjoyment of life, in amounts to be determined at trial;

362. Order Defendant to pay Plaintiffs and Charging Parties punitive damages for their intentional and reckless discrimination, in amounts to be determined at trial;

363. Grant other relief as this Court deems necessary and proper in the public interest; and

364. Award Attorney fees and costs related to this matter.

## JURY TRIAL DEMANDED

365. Plaintiffs and Charging Parties request a jury trial on all questions of fact raised by this Complaint.

Respectfully Submitted:

*s / Joseph E. Donohue, IV*
Joseph E. Donohue, IV, Esq.
SC Bar No.: 104318
U.S. District ID: 14341
J. Donohue Law, LLC
431 Saint James Ave. Ste. L PMB 194

Goose Creek, SC 29445
854-854-5253 (P)
854-205-4353 (F)
joey@jdonohuelaw.com
Attorney for Plaintiffs

Goose Creek, SC
December 5, 2024